**EXHIBIT 1**

MDS000302201554

**MASTER AGREEMENT**
AT&T MA Reference No. MA10201

CUSTOM PRICING (PA(

*FILE*

| CUSTOMER Legal Name ("Customer") | AT&T Corp. ("AT&T") |
|---|---|
| Nook Net | AT&T Corp. |
| **CUSTOMER Address** | **AT&T Address** |
| P.O. Box 970<br>Nome, Alaska<br>99762 | 55 Corporate Drive<br>Room 15D85<br>Bridgewater, New Jersey  08807 |
| **CUSTOMER Contact** | **AT&T Contact** |
| Name: Ramon Gandia<br>Title: Owner<br>Telephone: (907) 443-7575<br>Fax: (907) 443-2487<br>Email: | AT&T Internet Services Contract Management<br>FAX Number 800-235-7527 |
| **CUSTOMER Billing Address** | |
| P.O. Box 970<br>Nome, Alaska<br>99762 | |

This Agreement consists of this Cover Page, the attached General Terms and Conditions and all Service Attachments ("Attachments") attached here subsequently signed by the parties (collectively, this "Agreement"). Attachments shall include AT&T Service Order Attachments that reference this Agree and the relevant information in the AT&T Service Guide at http://www.att.com/abs/serviceguide. In the event of conflict between the General Terms Conditions and any Attachment, the Attachment shall take precedence.

This Agreement shall become effective when signed by both parties and shall continue in effect for as long as any Attachment remains in effect, unless e terminated in accordance with the provisions of the Agreement. The term of each Attachment is stated in the Attachment.

**As of the effective date of this Agreement, the Attachments are as follows:**

| SERVICE(S) ORDERED | | |
|---|---|---|
| ☐ AT&T Asynchronous Transfer Mode ("ATM") Services (Domestic & International)<br>☐ AT&T Contract Tariff<br>☐ AT&T Enhanced Announcement Services<br>☐ AT&T Frame Relay Plus Service<br>☐ AT&T International Services (Concert)<br>☒ AT&T Internet Services<br>☐ AT&T Global Network Services | ☐ AT&T Intrastate Services Agreement<br>☐ AT&T Managed Network Solution ("MNS")<br>Managed Router Solution Services<br>☐ AT&T Teleconference Service Options<br>☐ AT&T Tariffed Pricing Plan<br>☐ AT&T Wireless Services | ☐ Local Services<br>☐ AT&T – Single State<br>☐ AT&T – Multi-State<br>☐ TCG – Single State<br>☐ TCG – Multi-State<br>☐ TCG - Tariffed Pricing Plan |

CUSTOMER'S SIGNATURE BELOW ACKNOWLEDGES THAT CUSTOMER HAS READ AND UNDERSTANDS EACH OF THE TERMS AND CONDITIONS OF THIS AGREEMENT AND AGREES TO BE BOUND BY THEM.

CUSTOMER: Nook Net

By: _(signature)_
(Authorized Signature)

RAMON F. GANDIA
(Typed or Printed Name)

OWNER
(Title)

MARCH 8, 2000
(Date)

AT&T CORP.

By: _(signature)_
(Authorized Signature)

Kathleen M. Syvertsen
(Typed or Printed Name) Contract Manager

(Title)

3-17-00
(Date)

MDS000302201554

AT&T MA Reference No. _____

## CPNI Customer Notice and Consent

You can help us offer you products and services tailored to your needs with a one-stop shopping experience. If you consent below, we could share your CPNI with groups within AT&T, its affiliates, and third parties to bring to your attention products and services that might interest you. CPNI (Customer Proprietary Network Information) includes telecommunications services information from your telephone bills or network services related to the quantity, technical configuration, type, destination and amount, whether long distance, local, and/or wireless. Under federal law, you have a right and AT&T a duty to protect the confidentiality of CPNI. You may refuse to allow such use of your CPNI. This refusal will not affect the services that AT&T provides to you.

Your signature below approves AT&T's use of your CPNI as described above. It is valid until revoked. You may revoke approval at any time by providing written notice to AT&T at the address above. Your signature acknowledges that you are authorized to sign this consent.

Customer Signature: _____ Title: _____ Date: _____

### For AT&T Internal Use Only

Global Strata
Branch Code: _____    Account Group Code: _____

Growth Strata
Branch PID: _____    Branch Manager: _____    Customer ID (CID): _____

## GENERAL TERMS AND CONDITIONS

The following terms and conditions shall apply to the provision and use of the products and services (individually a "Service" and collectively the "Services") provided pursuant to the Attachments.

**1.0 DEFINITIONS**
1.1 "Affiliate" of a party means any entity that controls, is controlled by or is under common control with such party, and, in the case of AT&T, it also means any entity which AT&T has authorized to offer any Service or part of any Service.
1.2 "Content" means information made available, displayed or transmitted in connection with a Service (including, without limitation, information made available by means of an HTML "hot link", a third party posting or similar means) including all trademarks, service marks and domain names contained therein as well as the contents of any bulletin boards or chat forums, and, all updates, upgrades, modifications and other versions of any of the foregoing.
1.3 "User" means anyone who uses or accesses any Service purchased by CUSTOMER under this Agreement.

**2.0 CHARGES AND BILLING**
2.1 CUSTOMER shall pay AT&T for its and Users' use of the Services at the rates and charges specified in the Attachments, without deduction, setoff or delay for any reason, including circumstances arising under any other Attachment. Charges set forth in the Attachments are exclusive of any applicable taxes. CUSTOMER may be required at any time to pay a deposit if AT&T determines that AT&T is not creditworthy or as specified in Section 10.1.
2.2 CUSTOMER shall pay all shipping charges, taxes (excluding those on AT&T's net income) and other similar charges (and any related interest and penalties) relating to the sale, transfer of ownership, installation, license, use or provision of the Services, except to the extent a valid tax exemption certificate is provided by CUSTOMER to AT&T prior to the delivery of Services.
2.3 Payment is due within thirty (30) days after the date of invoice and shall refer to the invoice number. Restrictive endorsements or other statements on checks accepted by AT&T will not apply. CUSTOMER shall reimburse AT&T for all costs (including reasonable attorney fees) associated with collecting delinquent or dishonored payments. At AT&T's option, interest charges may be added to any past due amounts at the lower of 1.5% per month or the maximum rate allowed by law.

**3.0 RESPONSIBILITIES OF THE PARTIES**
3.1 AT&T shall provide Services to CUSTOMER in accordance with the terms and conditions, and at the charges specified in this Agreement, consistent with all applicable laws and regulations.
3.2 CUSTOMER shall assure that its and Users' use of the Services and the Content will at all times comply with all applicable laws, regulations and written and electronic instructions for use. AT&T reserves the right to terminate affected Attachments, suspend affected Services and/or remove CUSTOMER or Users' Content from the Services if AT&T determines that such use or Content does not conform with the requirements set forth in this Agreement or receives notice from anyone that CUSTOMER's or Users' use or Content may violate any laws or regulations. AT&T's actions or inaction under this Section shall not constitute review or approval of CUSTOMER's or Users' use or Content. AT&T will use reasonable efforts to provide notice to CUSTOMER of any violation or threatened violation of this Section 3.2 when reasonably practicable under the circumstances.

**4.0 USE OF INFORMATION**
4.1 All documentation, technical information, Software, business information, or other materials that are disclosed by either party to the other in the course of performing this Agreement shall be considered proprietary information ("INFORMATION") of the disclosing party, provided such information is in written or other tangible form that is clearly marked as "proprietary" or "confidential", or is disclosed orally and is both identified as proprietary or confidential at the time of disclosure and summarized in a writing so marked within fifteen (15) business days following the oral disclosure. This Agreement shall be

deemed to be AT&T and CUSTOMER INFORMATION. CUSTOMER Content sh deemed to be CUSTOMER INFORMATION.
4.2 Each party's INFORMATION shall, for a period of three (3) years follow disclosure (except in the case of Software, for an indefinite period): (i) be h confidence; (ii) be used only for purposes of performing this Agreement (including case of AT&T, the ability to monitor and record CUSTOMER transmissions in o detect fraud, check quality, and to operate, maintain and repair the Services) and the Services; and (iii) not be disclosed except to the receiving party's employees, and contractors having a need-to-know (provided that such agents and contractors direct competitors of either party and agree in writing to use and disclosure restricti restrictive as this Article 4), or to the extent required by law (provided that prompt a notice is provided to the disclosing party to the extent practicable).
4.3 The restrictions in Section 4.2 shall not apply to any information that independently developed by the receiving party; or (ii) is lawfully received by the re party free of any obligation to keep it confidential; or (iii) becomes generally avail the public other than by breach of this Agreement.

**5.0 PUBLICITY AND MARKS**
5.1 No public statements or announcements relating to this Agreement s issued by either party without the prior written consent of the other party.
5.2 Each party agrees not to display or use, in advertising or otherwise, an other party's trade names, logos, trademarks, service marks or other indicia o (collectively "Marks") without the other party's written consent, provided th consent may be revoked at any time.

**6.0 SOFTWARE**
6.1 AT&T grants CUSTOMER a personal, non-transferable and non-e license (without the right to sublicense) to use, in object code form, all softw associated written and electronic documentation and used in connection with the Servi Attachments (collectively, the "Software"), solely in connection with the Services a in accordance with applicable written and electronic documentation. CUSTO refrain from taking any steps to reverse assemble, reverse compile or otherwise source code version of the Software. The Software shall at all times remain the exclusive property of AT&T or its suppliers. "Third-Party Software" means Soft bears a copyright notice of a third party. "AT&T Software" means all Software o Third-Party Software.
6.2 CUSTOMER shall not copy or download the Software, except to 1 expressly provided otherwise in the applicable documentation for the Servic writing signed by AT&T. Any copy must contain the same copyright no proprietary markings as the original Software.
6.3 CUSTOMER shall assure that Users comply with the terms and of this Article 6.
6.4 The term of the license granted hereunder shall be coterminous Attachment which covers the Software.
6.5 CUSTOMER agrees to comply with any additional restrictions provided with any Third-Party Software.
6.6 AT&T warrants that all AT&T Software will perform substantially in a with its applicable published specifications during a warranty period of ninety beginning on the date of delivery of the AT&T Software to CUSTOMER. If Cl returns to AT&T, within the ninety (90) day warranty period, any AT&T Softwan not comply with this warranty, then AT&T, at its option, will either repair or r portion of the AT&T Software that does not comply or refund the amou CUSTOMER for such failed or defective AT&T Software. This warranty will a the AT&T Software is used in accordance with the terms of this Agreement altered, modified or tampered with by CUSTOMER o

MDS00030220

AT&T PROPRIETARY
Page 1 of 3

MDS000302201554

**7.0    DISPUTE RESOLUTION**
Disputes under this Agreement shall be submitted to binding arbitration, subject to the exceptions and in accordance with the procedures set forth in the AT&T Service Guide .

**8.0    FORCE MAJEURE**
Neither AT&T nor CUSTOMER shall be liable for any delay, failure in performance, loss or damage due to: fire, explosion, power blackout, earthquake, flood, the elements, strike, embargo, labor disputes, acts of civil or military authority, war, acts of God, acts or omissions of carriers or suppliers, acts of regulatory or governmental agencies, or other causes beyond such party's reasonable control, whether or not similar to the foregoing, except that CUSTOMER's obligation to pay for charges incurred for Services received by CUSTOMER shall not be excused.

**9.0    LIMITATIONS OF LIABILITY**
9.1    For purposes of Articles 8, 9 and 11 and all other exclusive remedies and limitations of liability set forth in this Agreement or any Attachment, "AT&T" shall be defined as AT&T, its Affiliates, and its and their employees, directors, officers, agents, representatives, subcontractors, interconnection service providers and suppliers; and "CUSTOMER" shall be defined as CUSTOMER, its Affiliates, and its and their employees, directors, officers, agents, and representatives; and "Damages" will refer collectively to all injury, damage, liability, loss, expense, penalty, interest and expense incurred.
9.2    EITHER PARTY'S ENTIRE LIABILITY AND THE OTHER PARTY'S EXCLUSIVE REMEDIES, FOR ANY DAMAGES CAUSED BY ANY SERVICE DEFECT OR FAILURE, OR FOR OTHER CLAIMS ARISING IN CONNECTION WITH ANY SERVICE OR PERFORMANCE OR NON-PERFORMANCE OF OBLIGATIONS UNDER THIS AGREEMENT SHALL BE:
(i)    FOR BODILY INJURY OR DEATH TO ANY PERSON, OR REAL OR TANGIBLE PROPERTY DAMAGE, NEGLIGENTLY CAUSED BY A PARTY, OR DAMAGES ARISING FROM THE WILLFUL MISCONDUCT OF A PARTY OR A BREACH OF THE PROVISIONS OF ARTICLES 4 OR 5, THE OTHER, PARTY'S RIGHT TO PROVEN DIRECT DAMAGES;
(ii)    FOR DEFECTS OR FAILURES OF SOFTWARE, THE REMEDIES SET FORTH IN SECTION 6.6;
(iii)    FOR INDEMNITY, THE REMEDIES SET FORTH IN ARTICLE 11;
(iv)    FOR DAMAGES OTHER THAN THOSE SET FORTH ABOVE AND NOT EXCLUDED UNDER THIS AGREEMENT OR ANY ATTACHMENT, EACH PARTY'S LIABILITY SHALL BE LIMITED TO PROVEN DIRECT DAMAGES NOT TO EXCEED PER CLAIM (OR IN THE AGGREGATE DURING ANY TWELVE (12) -MONTH PERIOD) AN AMOUNT EQUAL TO THE TOTAL NET PAYMENTS PAYABLE BY CUSTOMER FOR THE APPLICABLE SERVICE UNDER THE APPLICABLE ATTACHMENT DURING THE TWELVE (12) MONTHS PRECEDING THE MONTH IN WHICH THE DAMAGE OCCURRED.    THIS SECTION 9.2(iv) SHALL NOT LIMIT CUSTOMER'S RESPONSIBILITY FOR THE PAYMENT OF ANY AND ALL PROPERLY DUE CHARGES UNDER THIS AGREEMENT.
9.3    EXCEPT FOR THE PARTIES' ARTICLE 11 INDEMNIFICATION OBLIGATIONS, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, RELIANCE OR SPECIAL DAMAGES, INCLUDING WITHOUT LIMITATION, DAMAGES FOR LOST PROFITS, ADVANTAGE, SAVINGS OR REVENUES OF ANY KIND OR INCREASED COST OF OPERATIONS, WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.
9.4    AT&T ALSO SHALL NOT BE LIABLE FOR ANY DAMAGES ARISING OUT OF OR RELATING TO: INTEROPERABILITY, INTERACTION, ACCESS OR INTERCONNECTION PROBLEMS WITH APPLICATIONS, EQUIPMENT, SERVICES, CONTENT OR NETWORKS PROVIDED BY CUSTOMER OR THIRD PARTIES; SERVICE INTERRUPTIONS OR LOST OR ALTERED MESSAGES OR TRANSMISSIONS, EXCEPT AS OTHERWISE PROVIDED IN AN ATTACHMENT OR TARIFF; OR, UNAUTHORIZED ACCESS TO OR THEFT, ALTERATION, LOSS OR DESTRUCTION OF CUSTOMER'S, USERS' OR THIRD PARTIES' APPLICATIONS, CONTENT, DATA, PROGRAMS, INFORMATION, NETWORK OR SYSTEMS.
9.5    EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, AT&T MAKES NO WARRANTIES, EXPRESS OR IMPLIED, AND SPECIFICALLY DISCLAIMS ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE OR NON-INFRINGEMENT OR ANY WARRANTY ARISING BY USAGE OF TRADE, COURSE OF DEALING OR COURSE OF PERFORMANCE. AT&T DOES NOT WARRANT THAT THE SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE, OR THAT THE SERVICES WILL MEET CUSTOMER'S REQUIREMENTS OR THAT THE SERVICES WILL PREVENT UNAUTHORIZED ACCESS BY THIRD PARTIES. EQUIPMENT PROVIDED BY AT&T IN CONJUNCTION WITH A SERVICE IS PROVIDED ON AN "AS IS" BASIS. AT&T DOES NOT AUTHORIZE ANYONE TO MAKE A WARRANTY OF ANY KIND ON ITS BEHALF AND CUSTOMER SHOULD NOT RELY ON ANYONE MAKING SUCH STATEMENTS.
9.6    THE LIMITATIONS OF LIABILITY SET FORTH IN THIS ARTICLE 9 AND IN ANY ATTACHMENT SHALL APPLY: (i) REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT, STRICT LIABILITY OR OTHERWISE; AND (ii) WHETHER OR NOT DAMAGES WERE FORESEEABLE. THESE LIMITATIONS OF LIABILITY SHALL SURVIVE FAILURE OF ANY EXCLUSIVE REMEDIES PROVIDED IN THIS AGREEMENT.
9.7    This Agreement does not expressly or implicitly provide any third party (including Users) with any remedy, claim, liability, reimbursement, cause of action or other right or privilege.

**10.0    TERMINATION**
10.1    If a party fails to perform or observe any material term or condition Agreement and the failure continues unremedied for thirty (30) days after receipt o notice, (i) the other party may terminate for cause any Attachment affected by the or (ii) where the failure is a non-payment by CUSTOMER of any charge when due may, at its option, terminate affected Attachments, suspend Service under i Attachments, require a deposit under any or all Attachments as a condition of cor to provide Services and/or terminate this entire Agreement.
10.2    An Attachment may be terminated immediately upon written notice either party if the other party has violated the other party's Marks, becomes insol involved in a liquidation or termination of its business, files a bankruptcy petition, involuntary bankruptcy petition filed against it (if not dismissed within thirty (30) o filing), becomes adjudicated bankrupt, or becomes involved in an assignment i benefit of its creditors; or (ii) either party due to a material breach of any provision of 4, or AT&T pursuant to Section 3.2 or due to a material breach by CUSTOMER provision of Article 6.
10.3    CUSTOMER shall be responsible for payment of all charges un terminated Attachment incurred as of the effective date of termination. CUSTOMER also be liable to AT&T for Termination Charges, if specified in a terminated Attachme the event that AT&T terminates under Section 10.1 or 10.2, or CUSTOMER termi without cause.
10.4    Termination by either party of an Attachment does not waive any other i or remedies it may have under this Agreement.
10.5    Except as provided under Section 10.1, termination or suspension o Attachment shall not affect the Services provided or the rights and obligations o parties under any other Attachment.

**11.0    INDEMNITY**
11.1    AT&T agrees to defend or settle, at its own expense, any third party claim suit against CUSTOMER alleging that a Service furnished under this Agreement infrin any United States patent, trademark, copyright or trade secret, except where the clain suit arises out of or results from: CUSTOMER's or User's Content in connection with Service; modifications to the Service made by or combinations of the Service with servi or products provided by CUSTOMER or others; AT&T's adherence to CUSTOMER written requirements; or, use of the Service in violation of this Agreement. CUSTOM agrees to defend or settle, at its own expense and without prejudice to AT&T or AT& continued provisioning of the Service to CUSTOMER or others, all claims or suits agai any activity which gives rise to the alleged infringent. The indemnifying party will al pay all Damages and costs (including reasonable attorneys' fees) that by final judgme may be assessed against the indemnified party due to infringement by the indemnifyi party.
11.2    In the event of a claim of infringement for which AT&T is the indemnifying par under Section 11.1, AT&T may at its option either procure the right to continue using, o replace or modify, the alleged infringing Service so that the Service becomes noninfringin and substantially compliant with the requirements in the applicable Attachment. Upo inability to reasonably perform either of the foregoing options, AT&T may terminate th affected Attachment, without liability other than as stated in Section 11.1.
11.3    AT&T grants to CUSTOMER the right to permit Users to access and use the Services, provided that CUSTOMER shall remain solely responsible for the access and use by any User of the Services, and shall defend, indemnify and hold harmless AT&T from and against all Damages, arising out of third party claims and regardless of the form of action, whether in contract, tort, strict liability or otherwise, concerning or relating to: any noncompliance by CUSTOMER or Users with any provision of this Agreement; negligent acts or omissions by CUSTOMER or Users; CUSTOMER's or Users' Content; or, any Service failure, defect or outage. CUSTOMER's indemnification obligations do not apply to claims for Damages to real or tangible property or bodily injury or death negligently caused by AT&T.
11.4    With respect to the indemnification obligations in this Article 11: (i) the indemnified party will notify the indemnifying party in writing promptly upon learning of any claim or suit for which indemnification may be sought, provided that failure to do so shall not affect the indemnity except to the extent the indemnifying party is prejudiced thereby; (ii) the indemnifying party shall have control of the defense or settlement, provided that the indemnified party shall have the right to participate in such defense or settlement with counsel of its own selection and at its sole expense; and (iii) the indemnified party shall reasonably cooperate with the defense, at the indemnifying party's expense.

**12.0    BUSINESS DOWNTURN / NETWORK OPTIMIZATION**
In the event of a business downturn beyond the control of CUSTOMER, a corporate divestiture, merger, acquisition or significant restructuring or reorganization or network optimization, any of which significantly reduces the volume of Services required by CUSTOMER, with the result that CUSTOMER will be unable to meet its revenue and/or volume commitments under an Attachment, AT&T and CUSTOMER will cooperate in efforts to develop a mutually agreeable alternative. If the parties reach mutual agreement on an alternative, AT&T will prepare and file any necessary tariff revisions and/or the parties will sign a contractual amendment, as applicable. This provision shall not apply to a change resulting from a decision by CUSTOMER to transfer portions of its traffic or projected growth to service providers other than AT&T. CUSTOMER must give AT&T written notice of the conditions it believes will require the application of this provision. This provision does not constitute a waiver of any charges, including shortfall charges, incurred by CUSTOMER prior to the time the parties mutually agree to amend or replace the affected Attachment.

MDS000302201554

**13.0 'YEAR 2000 COMPATIBILITY**

If, as a result of the date change from the year 1999 to the year 2000, the Services provided under an Attachment fail to perform in accordance with AT&T's published specifications for such Services, in a way that is material and adverse to CUSTOMER, AT&T will take reasonable steps to correct such failure, at no additional cost to CUSTOMER, as CUSTOMER's exclusive remedy. AT&T is not responsible for any failures caused by: (i) a connecting carrier; (ii) use of the Services with any products, data or services that are not themselves Year 2000 Compliant; (iii) the CUSTOMER or Users; or (iv) the failure of power, equipment, services or systems not provided by AT&T.

**14.0 GENERAL PROVISIONS**

14.1    Any supplement, modification or waiver of any provision of this Agreement must be in writing and signed by authorized representatives of both parties. A waiver by either party of any breach of this Agreement shall not operate as a waiver of any other breach of this Agreement.

14.2    This Agreement may not be assigned by either party without the prior written consent of the other, except that either party may, without the other party's consent, assign this Agreement or any Attachment to a present or future Affiliate or successor, provided that any such assignment by CUSTOMER shall be contingent upon AT&T determining the assignee to be creditworthy and in compliance with any eligibility criteria for the Services. AT&T may subcontract work to be performed under this Agreement, but shall retain responsibility for all such work.

14.3    If any portion of this Agreement is found to be invalid or unenforceable, the remaining provisions shall remain in effect and the parties shall promptly begin negotiations to replace invalid or unenforceable portions that are essential parts of this Agreement.

14.4    Any initial demand for arbitration pursuant to Article 7 and any legal action arising in connection with this Agreement must begin within two (2) years after the cause of action arises.

14.5    All notices under this Agreement shall be in writing and either mailed by certified or registered mail, postage prepaid return receipt requested, sent by express courier or hand delivered and addressed to each party at the address set forth on the Cover Page of this Agreement or, if the notice relates to a specific Attachment, the address set forth in such Attachment, or, in any case, such other address as a party designates in writing.

14.6    State law issues concerning construction, interpretation and performance of this Agreement shall be governed by the substantive law of the State of New York, excluding its choice of law rules. The United Nations Convention on Contracts for International Sale of Goods shall not apply.

14.7    The respective obligations of CUSTOMER and AT&T, which by their nature would continue beyond the termination or expiration of any Attachment or this Agreement, including, without limitation, the obligations regarding confidentiality, publicity and marks, limitations of liability and dispute resolution, shall survive termination or expiration.

14.8    This Agreement creates an independent contractor relationship between the parties and neither party's employees or contractors shall be considered employees, contractors, partners or agents of the other party.

14.9    THIS AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SERVICES TO BE PROVIDED HEREUNDER. THIS AGREEMENT SUPERSEDES ALL PRIOR AGREEMENTS, PROPOSALS, REPRESENTATIONS, STATEMENTS OR UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, CONCERNING SUCH SERVICES OR THE RIGHTS AND OBLIGATIONS RELATING TO THOSE SERVICES. THIS AGREEMENT SHALL NOT BE CONTRADICTED, EXPLAINED OR SUPPLEMENTED BY ANY WRITTEN OR ORAL STATEMENTS, PROPOSALS, REPRESENTATIONS, ADVERTISEMENTS, SERVICE DESCRIPTIONS OR CUSTOMER PURCHASE ORDER FORMS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT OR AN ATTACHMENT.

MDS000303184390

**AT&T MA Reference No.** _MA 102_

**AT&T Internet Transport Services - Service Order Attachment**

| CUSTOMER Legal Name ("CUSTOMER") | AT&T Corp. ("AT&T") | AT&T Sales Contact Name |
|---|---|---|
| Nook Net | AT&T Corp. | Jamie Smith |
| **CUSTOMER Address** | **AT&T Address** | **AT&T Sales Contact Address** |
| P.O. Box 970<br>Nome, Alaska<br>99762 | 55 Corporate Drive<br>Bridgewater, New Jersey 08807 | 210 East Bluff Drive<br>Anchorage, Alaska 99501 |
| **CUSTOMER Contact** | **AT&T Contact** | **AT&T Sales Contact Information** |
| Name: Ramon Gandia<br>Title: Owner<br>Telephone: (907) 443-7575<br>Fax: (907) 443-2487<br>Email: | Name: Master Agreement Support Team<br>Title: District Manager<br>Telephone: 908-658-7028<br>Fax: 908-306-3788<br>Email: mast@att.com | Telephone: (907) 264-7340<br>Fax: (907) 777-2500<br>Email: jasmith@alascom.att.com<br>Branch Manager: Frazier, Cleve<br>Sales Strata: Growth<br>Sales Region: Western |
| **CUSTOMER Billing Address** | **CUSTOMER Account Information** | **AT&T Authorized Agent Info. (if applicable)** |
| P.O. Box 970<br>Nome, Alaska<br>99762 | CUSTOMER Account Number or<br>Master Account Number: CA4225 | Name:<br>Company Name:<br><br>Telephone:<br>Email:<br>Agent Code: |

This Service Order Attachment is an Attachment to the Master Agreement dated _3-17, 00_ between CUSTOMER and AT&T Corp. ("Agreement") and an integral part of that Agreement. Except as provided in this Service Order Attachment, the service descriptions, pricing information and other terms and conditions relating to Internet Services in the AT&T Service Guide at url: http://www.att.com/ebs/serviceguide, as amended from time to time, are incorporated into this Service Order Attachment by this reference. In the event of conflict among the terms, the order of priority shall be this Service Order Attachment, the AT&T Service Guide, and then the Master Agreement General Terms and Conditions.

The Services provided under this Service Order Attachment are (check all that apply):

☒ AT&T Managed Internet Service ☐ AT&T Virtual Private Network Service ☐ AT&T Asynchronous Service

☐ AT&T Concert InternetPlus Service ☐ AT&T DSL Internet Service ☐ AT&T Automotive Network Services

This Service Order Attachment is effective when signed by both CUSTOMER and AT&T.

CUSTOMER HAS READ AND UNDERSTANDS EACH OF THE TERMS AND CONDITIONS OF THIS SERVICE ORDER ATTACHMENT AND THE APPLICABLE PARTS OF THE AT&T SERVICE GUIDE AND AGREES TO BE BOUND BY THEM.

**AT&T PROPRIETARY**

MA_IPTRANS
02/22/2000

MDS0003031843


**AT&T**
Alascom

# AT&T Alascom Network Services
## Pricing Plan Commitment Form

| CUSTOMER NAME:<br>**Nook Net**<br>("Customer") | COMPANY NAME:<br>**AT&T Alascom**<br>("AT&T Alascom") | MASTER CUSTOMER NUMBER:<br>**ME2539** |
|---|---|---|
| CUSTOMER ADDRESS<br>**PO Box 970** | AT&T ALASCOM ADDRESS:<br>**210 East Bluff Drive** | PROMO CODE NUMBER (AAVPP/FRVPP ONLY) |
| CUSTOMER ADDRESS (CONT'D) | AT&T ALASCOM ADDRESS (CONT'D) | AT&T ALASCOM CONTACT NAME:<br>**Dan Freitas** |
| CITY: **Nome**<br>STATE: **AK**<br>ZIP CODE: **99762** | CITY: **Anchorage**<br>STATE: **AK**<br>ZIP CODE: **99501-1100** | AT&T ALASCOM CONTACT PHONE NUMBER:<br>**(907) 264 - 7254** |

Customer hereby places an order for an AT&T Alascom Pricing Plan as follows (Select only one):

### AT&T Alascom Pricing Plan ("X" THE PLAN BEING ACTIVATED)

- ■ Private Line Commercial Term Discount Plan
- ☐ Private Line Government Services Term Discount Plan
- ☐ Private Line AT&T Alascom Volume Pricing Plan
- ☐ Frame Relay Volume Pricing Plan
- ☐ Frame Relay Term Discount Plan

The following provisions apply to all orders: Service will be provided under the Pricing Plan you have selected subject to the rates and terms and conditions in the applicable tariffs as they may be modified from time to time (the "Tariff"). The Tariff constitutes the entire agreement between Customer and AT&T Alascom with respect to the services provided under Pricing Plan, and supersedes any and all prior agreements, proposals, representations, statements, or understandings, whether written or oral, concerning such services or the rights and obligations relating to such services. Customer shall provide installation instructions and other information as required by the Tariff.

### Commitment Levels (Complete this section for Volume Pricing Plans, In addition to Addendum A - Liability)

| | |
|---|---|
| ☐ One(1) Year Commitment | ☐ $2,000 Revenue Commitment |
| | ☐ $5,000 Revenue Commitment |
| ☐ Two (2) Year Commitment | ☐ $10,000 Revenue Commitment |
| | ☐ $25,000 Revenue Commitment |
| ☐ Three (3) Year Commitment | ☐ $50,000 Revenue Commitment |
| | ☐ $75,000 Revenue Commitment |
| ☐ Four (4) Year Commitment | ☐ $100,000 Revenue Commitment |
| | ☐ $200,000 Revenue Commitment |
| ☐ Five (5) Year Commitment | ☐ $350,000 Revenue Commitment |
| | ☐ $500,000 Revenue Commitment |

### Commitment Levels (Complete this section for Commercial or Government Term Discount Plan)

Term Commitment:

- ☐ One Year Commitment
- ☐ Two Year Commitment
- ■ Three Year Commitment
- ☐ Four Year Commitment
- ☐ Five Year Commitment

MDS000303184390

## MASTER AGREEMENT
### AT&T MA Reference No. _MA10201_

_FILE_

| CUSTOMER Legal Name ("Customer") | AT&T Corp. ("AT&T") |
|---|---|
| Nook Net | AT&T Corp. |
| **CUSTOMER Address** | **AT&T Address** |
| P.O. Box 970<br>Nome, Alaska<br>99762 | 55 Corporate Drive<br>Room 15D85<br>Bridgewater, New Jersey  08807 |
| **CUSTOMER Contact** | **AT&T Contact** |
| Name: Ramon Gandia<br>Title: Owner<br>Telephone: (907) 443-7575<br>Fax: (907) 443-2487<br>Email: | AT&T Internet Services Contract Management<br>FAX Number 800-235-7527 |
| **CUSTOMER Billing Address** | |
| P.O. Box 970<br>Nome, Alaska<br>99762 | |

This Agreement consists of this Cover Page, the attached General Terms and Conditions and all Service Attachments ("Attachments") attached hereto subsequently signed by the parties (collectively, this "Agreement"). Attachments shall include AT&T Service Order Attachments that reference this Agreement and the relevant information in the AT&T Service Guide at http://www.att.com/abs/serviceguide. In the event of conflict between the General Terms and Conditions and any Attachment, the Attachment shall take precedence.

This Agreement shall become effective when signed by both parties and shall continue in effect for as long as any Attachment remains in effect, unless earlier terminated in accordance with the provisions of the Agreement. The term of each Attachment is stated in the Attachment.

**As of the effective date of this Agreement, the Attachments are as follows:**

| SERVICE(S) ORDERED | | |
|---|---|---|
| ☐ AT&T Asynchronous Transfer Mode ("ATM") Services (Domestic & International)<br>☐ AT&T Contract Tariff<br>☐ AT&T Enhanced Announcement Services<br>☐ AT&T Frame Relay Plus Service<br>☐ AT&T International Services (Concert)<br>☒ AT&T Internet Services<br>☐ AT&T Global Network Services | ☐ AT&T Intrastate Services Agreement<br>☐ AT&T Managed Network Solution ("MNS") Managed Router Solution Services<br>☐ AT&T Teleconference Service Options<br>☐ AT&T Tariffed Pricing Plan<br>☐ AT&T Wireless Services | Local Services<br>☐ AT&T – Single State<br>☐ AT&T – Multi-State<br>☐ TCG – Single State<br>☐ TCG – Multi-State<br>☐ TCG - Tariffed Pricing Plan |

**CUSTOMER'S SIGNATURE BELOW ACKNOWLEDGES THAT CUSTOMER HAS READ AND UNDERSTANDS EACH OF THE TERMS AND CONDITIONS OF THIS AGREEMENT AND AGREES TO BE BOUND BY THEM.**

CUSTOMER: Nook Net

By: _(signature)_
(Authorized Signature)

_RAMON F. GANDIA_
(Typed or Printed Name)

_Owner_
(Title)

_MARCH 8, 2000_
(Date)

AT&T CORP.

By: _(signature)_
(Authorized Signature)

Kathleen M. Syvertsen
(Typed or Printed Name) **Contract Manager**

(Title)

_3-17-00_
(Date)

MDS000303184390

AT&T MA Reference No. _____

---

### CPNI Customer Notice and Consent

You can help us offer you products and services tailored to your needs with a one-stop shopping experience. If you consent below, we could share your CPNI with groups within AT&T, its affiliates, and third parties to bring to your attention products and services that might interest you. CPNI (Customer Proprietary Network Information) includes telecommunications services information from your telephone bills or network services records related to the quantity, technical configuration, type, destination and amount, whether long distance, local, and/or wireless. Under federal law, you have a right and AT&T a duty to protect the confidentiality of CPNI. You may refuse to allow such use of your CPNI. This refusal will not affect the services that AT&T provides to you.

Your signature below approves AT&T's use of your CPNI as described above. It is valid until revoked. You may revoke approval at any time by providing written notice to AT&T at the address above. Your signature acknowledges that you are authorized to sign this consent.

Customer Signature: _____   Title: _____   Date: _____

#### For AT&T Internal Use Only

Global Strata
Branch Code: _____   Account Group Code: _____

Growth Strata
Branch PID: _____   Branch Manager: _____   Customer ID (CID): _____

---

## GENERAL TERMS AND CONDITIONS

The following terms and conditions shall apply to the provision and use of the products and services (individually a "Service" and collectively the "Services") provided pursuant to the Attachments.

**1.0 DEFINITIONS**
1.1 "Affiliate" of a party means any entity that controls, is controlled by or is under common control with such party, and, in the case of AT&T, it also means any entity which AT&T has authorized to offer any Service or part of any Service.
1.2 "Content" means information made available, displayed or transmitted in connection with a Service (including, without limitation, information made available by means of an HTML "hot link", a third party posting or similar means) including all trademarks, service marks and domain names contained therein as well as the contents of any bulletin boards or chat forums, and, all updates, upgrades, modifications and other versions of any of the foregoing.
1.3 "User" means anyone who uses or accesses any Service purchased by CUSTOMER under this Agreement.

**2.0 CHARGES AND BILLING**
2.1 CUSTOMER shall pay AT&T for its and Users' use of the Services at the rates and charges specified in the Attachments, without deduction, setoff or delay for any reason, including circumstances arising under any other Attachment. Charges set forth in the Attachments are exclusive of any applicable taxes. CUSTOMER may be required at any time to pay a deposit if AT&T determines that CUSTOMER is not creditworthy or as specified in Section 10.1.
2.2 CUSTOMER shall pay all shipping charges, taxes (excluding those on AT&T's net income) and other similar charges (and any related interest and penalties) relating to the sale, transfer of ownership, installation, license, use or provision of the Services, except to the extent a valid tax exemption certificate is provided by CUSTOMER to AT&T prior to the delivery of Services.
2.3 Payment is due within thirty (30) days after the date of invoice and shall refer to the invoice number. Restrictive endorsements or other statements on checks accepted by AT&T will not apply. CUSTOMER shall reimburse AT&T for all costs (including reasonable attorney fees) associated with collecting delinquent or dishonored payments. At AT&T's option, interest charges may be added to any past due amounts at the lower of 1.5% per month or the maximum rate allowed by law.

**3.0 RESPONSIBILITIES OF THE PARTIES**
3.1 AT&T shall provide Services to CUSTOMER in accordance with the terms and conditions, and at the charges specified in this Agreement, consistent with all applicable laws and regulations.
3.2 CUSTOMER shall assure that its and Users' use of the Services and the Content will at all times comply with all applicable laws, regulations and written and electronic instructions for use. AT&T reserves the right to terminate affected Attachments, suspend affected Services and/or remove CUSTOMER or Users' Content from the Services if AT&T determines that such use or Content does not conform with the requirements set forth in this Agreement or receives notice from anyone that CUSTOMER's or Users' use or Content may violate any laws or regulations. AT&T's actions or inaction under this Section shall not constitute review or approval of CUSTOMER's or Users' use or Content. AT&T will use reasonable efforts to provide notice to CUSTOMER of any violation or threatened violation of this Section
3.2 when reasonably practicable under the circumstances.

**4.0 USE OF INFORMATION**
4.1 All documentation, technical information, Software, business information, or other materials that are disclosed by either party to the other in the course of performing this Agreement shall be considered proprietary information ("INFORMATION") of the disclosing party, provided such information is in written or other tangible form that is clearly marked as "proprietary" or "confidential", or is disclosed orally and is both identified as proprietary or confidential at the time of disclosure and summarized in a writing so marked within fifteen (15) business days following the oral disclosure. This Agreement shall be

deemed to be AT&T and CUSTOMER INFORMATION.  CUSTOMER Content sha deemed to be CUSTOMER INFORMATION.
4.2 Each party's INFORMATION shall, for a period of three (3) years followin disclosure (except in the case of Software, for an indefinite period): (i) be hel confidence; (ii) be used only for purposes of performing this Agreement (including in case of AT&T, the ability to monitor and record CUSTOMER transmissions in orde detect fraud, check quality, and to operate, maintain and repair the Services) and u the Services; and (iii) not be disclosed except to the receiving party's employees, ag and contractors having a need-to-know (provided that such agents and contractors are direct competitors of either party and agree in writing to use and disclosure restriction restrictive as this Article 4), or to the extent required by law (provided that prompt adva notice is provided to the disclosing party to the extent practicable).
4.3 The restrictions in Section 4.2 shall not apply to any information that: ( independently developed by the receiving party; or (ii) is lawfully received by the recei party free of any obligation to keep it confidential; or (iii) becomes generally availabl the public other than by breach of this Agreement.

**5.0 PUBLICITY AND MARKS**
5.1 No public statements or announcements relating to this Agreement shall issued by either party without the prior written consent of the other party.
5.2 Each party agrees not to display or use, in advertising or otherwise, any of other party's trade names, logos, trademarks, service marks or other indicia of or (collectively "Marks") without the other party's prior written consent, provided that s consent may be revoked at any time.

**6.0 SOFTWARE**
6.1 AT&T grants CUSTOMER a personal, non-transferable and non-exclus license (without the right to sublicense) to use, in object code form, all software a associated written and electronic documentation and data furnished pursuant to Attachments (collectively, the "Software"), solely in connection with the Services and so in accordance with applicable written and electronic documentation. CUSTOMER refrain from taking any steps to reverse assemble, reverse compile or otherwise deriv source code version of the Software. The Software shall at all times remain the sole a exclusive property of AT&T or its suppliers. "Third-Party Software" means Software t bears a copyright notice of a third party. "AT&T Software" means all Software other th Third-Party Software.
6.2 CUSTOMER shall not copy or download the Software, except to the exte expressly provided otherwise in the applicable documentation for the Service or in writing signed by AT&T. Any copy must contain the same copyright notices a proprietary markings as the original Software.
6.3 CUSTOMER shall assure that its Users comply with the terms and conditic of this Article 6.
6.4 The term of the license granted hereunder shall be coterminous with t Attachment which covers the Software.
6.5 CUSTOMER agrees to comply with any additional restrictions that a provided with any Third-Party Software.
6.6 AT&T warrants that all AT&T Software will perform substantially in accordan with its applicable published specifications during a warranty period of ninety (90) da beginning on the date of delivery of the AT&T Software to CUSTOMER. If CUSTOME returns to AT&T, within the ninety (90) day warranty period, any AT&T Software that do not comply with this warranty, then AT&T, at its option, will either repair or replace t portion of the AT&T Software that does not comply or refund the amount paid t CUSTOMER for such failed or defective AT&T Software. This warranty will apply only the AT&T Software is used in accordance with the terms of this Agreement and is n altered, modified or tampered with by CUSTOMER or User

MDS000303184390

**AT&T MA Reference No. _____**

**7.0    DISPUTE RESOLUTION**
Disputes under this Agreement shall be submitted to binding arbitration, subject to the exceptions and in accordance with the procedures set forth in the AT&T Service Guide .

**8.0    FORCE MAJEURE**
Neither AT&T nor CUSTOMER shall be liable for any delay, failure in performance, loss or damage due to: fire, explosion, power blackout, earthquake, flood, the elements, strike, embargo, labor disputes, acts of civil or military authority, war, acts of God, acts or omissions of carriers or suppliers, acts of regulatory or governmental agencies, or other causes beyond such party's reasonable control, whether or not similar to the foregoing, except that CUSTOMER's obligation to pay for charges incurred for Services received by CUSTOMER shall not be excused.

**9.0    LIMITATIONS OF LIABILITY**
9.1    For purposes of Articles 8, 9 and 11 and all other exclusive remedies and limitations of liability set forth in this Agreement or any Attachment, "AT&T" shall be defined as AT&T, its Affiliates, and its and their employees, directors, officers, agents, representatives, subcontractors, interconnection service providers and suppliers; and "CUSTOMER" shall be defined as CUSTOMER, its Affiliates, and its and their employees, directors, officers, agents, and representatives; and "Damages" will refer collectively to all injury, damage, liability, loss, penalty, interest and expense incurred.
9.2    EITHER PARTY'S ENTIRE LIABILITY AND THE OTHER PARTY'S EXCLUSIVE REMEDIES, FOR ANY DAMAGES CAUSED BY ANY SERVICE DEFECT OR FAILURE, OR FOR OTHER CLAIMS ARISING IN CONNECTION WITH ANY SERVICE OR PERFORMANCE OR NON-PERFORMANCE OF OBLIGATIONS UNDER THIS AGREEMENT SHALL BE:
(i)    FOR BODILY INJURY OR DEATH TO ANY PERSON, OR REAL OR TANGIBLE PROPERTY DAMAGE, NEGLIGENTLY CAUSED BY A PARTY, OR DAMAGES ARISING FROM THE WILLFUL MISCONDUCT OF A PARTY OR A BREACH OF THE PROVISIONS OF ARTICLES 4 OR 5, THE OTHER, PARTY'S RIGHT TO PROVEN DIRECT DAMAGES;
(ii)    FOR DEFECTS OR FAILURES OF SOFTWARE, THE REMEDIES SET FORTH IN SECTION 6.6;
(iii)    FOR INDEMNITY, THE REMEDIES SET FORTH IN ARTICLE 11;
(iv)    FOR DAMAGES OTHER THAN THOSE SET FORTH ABOVE AND NOT EXCLUDED UNDER THIS AGREEMENT OR ANY ATTACHMENT, EACH PARTY'S LIABILITY SHALL BE LIMITED TO PROVEN DIRECT DAMAGES NOT TO EXCEED PER CLAIM (OR IN THE AGGREGATE DURING ANY TWELVE (12) MONTH PERIOD) AN AMOUNT EQUAL TO THE TOTAL NET PAYMENTS PAYABLE BY CUSTOMER FOR THE APPLICABLE SERVICE UNDER THE APPLICABLE ATTACHMENT DURING THE TWELVE (12) MONTHS PRECEDING THE MONTH IN WHICH THE DAMAGE OCCURRED.    THIS SECTION 9.2(iv) SHALL NOT LIMIT CUSTOMER'S RESPONSIBILITY FOR THE PAYMENT OF ANY AND ALL PROPERLY DUE CHARGES UNDER THIS AGREEMENT.
9.3    EXCEPT FOR THE PARTIES' ARTICLE 11 INDEMNIFICATION OBLIGATIONS, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, RELIANCE OR SPECIAL DAMAGES, INCLUDING WITHOUT LIMITATION, DAMAGES FOR LOST PROFITS, ADVANTAGE, SAVINGS OR REVENUES OF ANY KIND OR INCREASED COST OF OPERATIONS, WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.
9.4    AT&T ALSO SHALL NOT BE LIABLE FOR ANY DAMAGES ARISING OUT OF OR RELATING TO: INTEROPERABILITY, INTERACTION, ACCESS OR INTERCONNECTION PROBLEMS WITH APPLICATIONS, EQUIPMENT, NETWORKS, CONTENT OR NETWORKS PROVIDED BY CUSTOMER OR THIRD PARTIES; SERVICE INTERRUPTIONS OR LOST OR ALTERED MESSAGES OR TRANSMISSIONS, EXCEPT AS OTHERWISE PROVIDED IN AN ATTACHMENT OR TARIFF; OR, UNAUTHORIZED ACCESS TO OR THEFT, ALTERATION, LOSS OR DESTRUCTION OF CUSTOMER'S, USERS' OR THIRD PARTIES' APPLICATIONS, CONTENT, DATA, PROGRAMS, INFORMATION, NETWORK OR SYSTEMS.
9.5    EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, AT&T MAKES NO WARRANTIES, EXPRESS OR IMPLIED, AND SPECIFICALLY DISCLAIMS ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE OR NON-INFRINGEMENT OR ANY WARRANTY ARISING BY USAGE OR TRADE, COURSE OF DEALING OR COURSE OF PERFORMANCE. AT&T DOES NOT WARRANT THAT THE SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE, OR THAT THE SERVICES WILL MEET CUSTOMER'S REQUIREMENTS OR THAT THE SERVICES WILL PREVENT UNAUTHORIZED ACCESS BY THIRD PARTIES. EQUIPMENT PROVIDED BY AT&T IN CONJUNCTION WITH A SERVICE IS PROVIDED ON AN 'AS IS' BASIS. AT&T DOES NOT AUTHORIZE ANYONE TO MAKE A WARRANTY OF ANY KIND ON ITS BEHALF AND CUSTOMER SHOULD NOT RELY ON ANYONE MAKING SUCH STATEMENTS.
9.6    THE LIMITATIONS OF LIABILITY SET FORTH IN THIS ARTICLE 9 AND IN ANY ATTACHMENT SHALL APPLY: (i) REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT, STRICT LIABILITY OR OTHERWISE; AND (ii) WHETHER OR NOT DAMAGES WERE FORESEEABLE. THESE LIMITATIONS OF LIABILITY SHALL SURVIVE FAILURE OF ANY EXCLUSIVE REMEDIES PROVIDED IN THIS AGREEMENT.
9.7    This Agreement does not expressly or implicitly provide any third party (including Users) with any remedy, claim, liability, reimbursement, cause of action or other right or privilege.

**10.0    TERMINATION**
10.1    If a party fails to perform or observe any material term or condition Agreement and the failure continues unremeded for thirty (30) days after receipt of notice, (i) the other party may terminate for cause any Attachment affected by the b or (ii) where the failure is a non-payment by CUSTOMER of any charge when due, may, at its option, terminate affected Attachments, suspend Service under a Attachments, require a deposit under any or all Attachments as a condition of con to provide Services and/or terminate this entire Agreement.
10.2    An Attachment may be terminated immediately upon written notice t either party if the other party has violated the other party's Marks, becomes insol involved in a liquidation or termination of its business, files a bankruptcy petition, i involuntary bankruptcy petition filed against it (if not dismissed within thirty (30) d filing), becomes adjudicated bankrupt, or becomes involved in an assignment f benefit of its creditors; or (ii) either party due to a material breach of any provision of 4, or AT&T pursuant to Section 3.2 or due to a material breach by CUSTOMER provision of Article 6.
10.3    CUSTOMER shall be responsible for payment of all charges un terminated Attachment incurred as of the effective date of termination. CUSTOMER also be liable to AT&T for Termination Charges, if specified in a terminated Attachm the event that AT&T terminates under Section 10.1 or 10.2, or CUSTOMER term without cause.
10.4    Termination by either party of an Attachment does not waive any other or remedies it may have under this Agreement.
10.5    Except as provided under Section 10.1, termination or suspension Attachment shall not affect the Services provided or the rights and obligations o parties under any other Attachment.

**11.0    INDEMNITY**
11.1    AT&T agrees to defend or settle, at its own expense, any third party cla suit against CUSTOMER alleging that a Service furnished under this Agreement infr any United States patent, trademark, copyright or trade secret, except where the cla suit arises out of or results from: CUSTOMER's or User's Content in connection wit Service; modifications to the Service made by or combinations of the Service with ser or products provided by CUSTOMER or others; AT&T's adherence to CUSTO written requirements; or use of the Service in violation of this Agreement. CUSTO agrees to defend or settle, at its own expense and without prejudice to AT&T or AT continued provisioning of the Service to CUSTOMER or others, all claims or suits ag AT&T covered by the exceptions in the preceding sentence and shall immediately c any activity which gives rise to the alleged infringement.  The indemnifying party will pay all Damages and costs (including reasonable attorneys' fees) that by final judg may be assessed against the indemnified party due to infringement by the indemni party.
11.2    In the event of a claim of infringement for which AT&T is the indemnifying p under Section 11.1, AT&T may at its option either procure the right to continue using replace or modify, the alleged infringing Service so that the Service becomes noninfrin and substantially compliant with the requirements in the applicable Attachment. L inability to reasonably perform either of the foregoing options, AT&T may terminate affected Attachment, without liability other than as stated in Section 11.1.
11.3    AT&T grants to CUSTOMER the right to permit Users to access and use Services, provided that CUSTOMER shall remain solely responsible for the access use by any User of the Services, and shall defend, indemnify and hold harmless A from and against all Damages, arising out of third party claims and regardless of the f of action, whether in contract, tort, strict liability or otherwise, concerning or relating any noncompliance by CUSTOMER or Users with any provision of this Agreem negligent acts or omissions by CUSTOMER or Users; CUSTOMER's or Users' Conten Service failure, defect or outage.  CUSTOMER's indemnification obligations do apply to claims for Damages to real or tangible property or bodily injury or de negligently caused by AT&T.
11.4    With respect to the indemnification obligations in this Article 11:  (i) indemnified party will notify the indemnifying party in writing promptly upon learning of claim or suit for which indemnification may be sought, provided that failure to do so s not affect the indemnity except to the extent the indemnifying party is prejudiced there (ii) the indemnifying party shall have control of the defense or settlement, provided that indemnified party shall have the right to participate in such defense or settlement v counsel of its own selection and at its sole expense; and (iii) the indemnified party sl reasonably cooperate with the defense, at the indemnifying party's expense.

**12.0    BUSINESS DOWNTURN / NETWORK OPTIMIZATION**
In the event of a business downturn beyond the control of CUSTOMER, a corpor divestiture, merger, acquisition or significant restructuring or reorganization or netw optimization, any of which significantly reduces the volume of Services required CUSTOMER, with the result that CUSTOMER will be unable to meet its revenue and volume commitments under an Attachment, AT&T and CUSTOMER will cooperate efforts to develop a mutually agreeable alternative. If the parties reach mutual agreem on an alternative, AT&T will prepare and file any necessary tariff revisions and/or parties will sign a contractual amendment, as applicable. This provision shall not apply a change resulting from a decision by CUSTOMER to transfer portions of its traffic projected growth to service providers other than AT&T.  CUSTOMER must give AT written notice of the conditions it believes will require the application of this provision. Tl provision does not constitute a waiver of any charges, including shortfall charges, incurr by CUSTOMER prior to the time the parties mutually agree to amend or replace t affected Attachment.

**AT&T PROPRIETARY**
**Page 2 of 3**

MDS000303184390

MDS000303184390

**13.0   .   YEAR 2000 COMPATIBILITY**
If, as a result of the date change from the year 1999 to the year 2000, the Services provided under an Attachment fail to perform in accordance with AT&T's published specifications for such Services, in a way that is material and adverse to CUSTOMER, AT&T will take reasonable steps to correct such failure, at no additional cost to CUSTOMER, as CUSTOMER's exclusive remedy. AT&T is not responsible for any failures caused by: (i) a connecting carrier; (ii) use of the Services with any products, data or services that are not themselves Year 2000 Compliant; (iii) the CUSTOMER or Users; or (iv) the failure of power, equipment, services or systems not provided by AT&T.

**14.0   GENERAL PROVISIONS**
14.1   Any supplement, modification or waiver of any provision of this Agreement must be in writing and signed by authorized representatives of both parties. A waiver by either party of any breach of this Agreement shall not operate as a waiver of any other breach of this Agreement.
14.2   This Agreement may not be assigned by either party without the prior written consent of the other, except that either party may, without the other party's consent, assign this Agreement or any Attachment to a present or future Affiliate or successor, provided that any such assignment by CUSTOMER shall be contingent upon AT&T determining the assignee to be creditworthy and in compliance with any eligibility criteria for the Services. AT&T may subcontract work to be performed under this Agreement, but shall retain responsibility for all such work.
14.3   If any portion of this Agreement is found to be invalid or unenforceable, the remaining provisions shall remain in effect and the parties shall promptly begin negotiations to replace invalid or unenforceable portions that are essential parts of this Agreement.
14.4   Any initial demand for arbitration pursuant to Article 7 and any legal action arising in connection with this Agreement must begin within two (2) years after the cause of action arises.
14.5   All notices under this Agreement shall be in writing and either mailed by certified or registered mail, postage prepaid return receipt requested, sent by express courier or hand delivered and addressed to each party at the address set forth on the Cover Page of this Agreement or, if the notice relates to a specific Attachment, the address set forth in such Attachment, or, in any case, such other address as a party designates in writing.
14.6   State law issues concerning construction, interpretation and performance of this Agreement shall be governed by the substantive law of the State of New York, excluding its choice of law rules. The United Nations Convention on Contracts for International Sale of Goods shall not apply.
14.7   The respective obligations of CUSTOMER and AT&T, which by their nature would continue beyond the termination or expiration of any Attachment or this Agreement, including, without limitation, the obligations regarding confidentiality, publicity and marks, limitations of liability and dispute resolution, shall survive termination or expiration.
14.8   This Agreement creates an independent contractor relationship between the parties and neither party's employees or contractors shall be considered employees, contractors, partners or agents of the other party.
14.9   THIS AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SERVICES TO BE PROVIDED HEREUNDER. THIS AGREEMENT SUPERSEDES ALL PRIOR AGREEMENTS, PROPOSALS, REPRESENTATIONS, STATEMENTS OR UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, CONCERNING SUCH SERVICES OR THE RIGHTS AND OBLIGATIONS RELATING TO THOSE SERVICES. THIS AGREEMENT SHALL NOT BE CONTRADICTED, EXPLAINED OR SUPPLEMENTED BY ANY WRITTEN OR ORAL STATEMENTS, PROPOSALS, REPRESENTATIONS, ADVERTISEMENTS, SERVICE DESCRIPTIONS OR CUSTOMER PURCHASE ORDER FORMS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT OR AN ATTACHMENT.

MDS000302201554

**AT&T MA Reference No.** *MA 10*

## AT&T Internet Transport Services - Service Order Attachment

| CUSTOMER Legal Name ("CUSTOMER") | AT&T Corp. ("AT&T") | AT&T Sales Contact Name |
|---|---|---|
| Nook Net | AT&T Corp. | Jamie Smith |
| **CUSTOMER Address** | **AT&T Address** | **AT&T Sales Contact Address** |
| P.O. Box 970<br><br>Nome, Alaska<br>99762 | 55 Corporate Drive<br>Bridgewater, New Jersey 08807 | 210 East Bluff Drive<br>Anchorage, Alaska 99501 |
| **CUSTOMER Contact** | **AT&T Contact** | **AT&T Sales Contact Information** |
| Name: Ramon Gandia<br>Title: Owner<br>Telephone: (907) 443-7575<br>Fax: (907) 443-2487<br>Email: | Name: Master Agreement Support Team<br>Title: District Manager<br>Telephone: 908-658-7028<br>Fax: 908-306-3788<br>Email: mast@att.com | Telephone: (907) 264-7340<br>Fax: (907) 777-2500<br>Email: jasmith@alascom.att.com<br>Branch Manager: Frazier, Cleve<br>Sales Strata: Growth<br>Sales Region: Western |
| **CUSTOMER Billing Address** | **CUSTOMER Account Information** | **AT&T Authorized Agent Info. (if applicable)** |
| P.O. Box 970<br>Nome, Alaska<br>99762 | CUSTOMER Account Number or<br>Master Account Number: **CA4225** | Name:<br>Company Name:<br><br>Telephone:<br>Email:<br>Agent Code: |

This Service Order Attachment is an Attachment to the Master Agreement dated _3-17, 00_ between CUSTOMER and AT&T Corp. ("Agreement") and an integral part of that Agreement. Except as provided in this Service Order Attachment, the service descriptions, pricing information and other terms and conditions relating to Internet Services in the AT&T Service Guide at
url: **http://www.att.com/abs/serviceguide**, as amended from time to time, are incorporated into this Service Order Attachment by this reference. In the even of conflict among the terms, the order of priority shall be this Service Order Attachment, the AT&T Service Guide, and then the Master Agreement General Terms and Conditions.

The Services provided under this Service Order Attachment are (check all that apply):

☒ AT&T Managed Internet Service      ☐ AT&T Virtual Private Network Service      ☐ AT&T Asynchronous Service

☐ AT&T Concert InternetPlus Service      ☐ AT&T DSL Internet Service      ☐ AT&T Automotive Network Services

This Service Order Attachment is effective when signed by both CUSTOMER and AT&T.

CUSTOMER HAS READ AND UNDERSTANDS EACH OF THE TERMS AND CONDITIONS OF THIS SERVICE ORDER ATTACHMENT AND THE APPLICABLE PARTS OF THE AT&T SERVICE GUIDE AND AGREES TO BE BOUND BY THEM.

**AT&T PROPRIETARY**

SENT BY:                          3- 7- 3 ; 3:42PM ;      BUSINESS SALES→        1 907 443 2487;#  2/8

AT&T M.A. Reference No. MA-10201

## AT&T Alascom Service Order Attachment – Voice/Data Services Attachment

| CUSTOMER Legal Name ( "Customer", "You" or "Your") | AT&T Corp. ("AT&T") | AT&T Sales Contact Name |
|---|---|---|
| Nook Net, LLC | AT&T Corp. | Dan  Preitas |
| **CUSTOMER Address** | **AT&T Address** | **AT&T Sales Contact Address** |
| PO Box 970<br>Nome<br>AK  USA<br>99762 | 55 Corporate Drive<br>Bridgewater, New Jersey  08807 | 210 East Bluff Dr. (MP 355)<br>Anchorage<br>AK  USA<br>99501-1100 |
| **CUSTOMER Contact**<br>Name: Ramon  Garcia<br>Title: Owner<br>Telephone: 907-443-7575<br>Fax: 907-443-2487<br>Email: rlg@nook.net | **AT&T Contact**<br>Master Agreement Support Team<br>Email:  mast@att.com | **AT&T Sales Contact Information**<br>Telephone: 907-264-7234<br>Fax 907-777-2534<br>Email: dreitas@alascom.att.com<br>Branch Manager: Lori  Eussen<br>Sales Strata.  Gwen  Sales Region: Alaska |
| **CUSTOMER Billing Address**<br>Same | **Customer Account Information**<br>Master Customer Number (MCN):   ME 2539<br><br>Plan ID No. | |

This Service Order Attachment (including its addenda, if any) is an Attachment to the Master Agreement between Customer and AT&T dated _____ and is an integral part of that Agreement. The order of priority in the event of inconsistency among terms shall be the Attachment, then the Master Agreement, and then the AT&T Business Service Guide at http://www.att.com/serviceguide/business.

In the event any of the Services Provided are detariffed, any references in this Attachment to the "Applicable Tariffs" relating to such services will be construed as references to the non-tariffed successor, known as the AT&T Business Service Guide at http://www.att.com/serviceguide/business.

In addition, for such domestic services, Section 9.2(iv) of the Master Agreement shall read as follows:

"FOR DAMAGES OTHER THAN THOSE SET FORTH ABOVE AND NOT EXCLUDED UNDER THIS AGREEMENT OR ANY ATTACHMENT, EACH PARTY'S LIABILITY SHALL BE LIMITED TO PROVEN DIRECT DAMAGES NOT TO EXCEED PER CLAIM (OR IN THE AGGREGATE DURING ANY TWELVE (12) MONTH PERIOD) AN AMOUNT EQUAL TO THE TOTAL NET PAYMENTS PAYABLE BY YOU FOR THE APPLICABLE SERVICE UNDER THIS ATTACHMENT DURING THE THREE (3) MONTHS PRECEDING THE MONTH IN WHICH THE DAMAGE OCCURRED. THIS SECTION 9.2(iv) SHALL NOT LIMIT YOUR RESPONSIBILITY FOR THE PAYMENT OF ANY AND ALL PROPERLY DUE CHARGES UNDER THIS AGREEMENT."

Customer hereby places an order for:

☐ New Attachment          ☒ Existing Attachment No. GCT 3          ☐ Amendment of Existing Attachment No.
                             3 Year, $120,000 Annual Commitment

Existing Pricing Plan Replacement/Discontinuance:
☐ Check here and identify any AT&T CT, Attachment, or other AT&T pricing plan being discontinued in conjunction with this order. Also specify the CT No./Attachment No., Plan ID No. or Main Billed Account No.  (Note:  Charges may apply as specified in the plan being discontinued.)
CT No./Attachment No. _____   Plan ID No. _____   Main Billed Account No. _____

**SIGNATURE BELOW BY YOUR AUTHORIZED REPRESENTATIVE IS YOUR CONSENT TO THE TERMS AND CONDITIONS OF THIS SERVICE ORDER ATTACHMENT.**

CUSTOMER Nook Net, LLC
By: _(signature)_
    (Authorized Signature)
RAMON F. GARCIA
(Typed or Printed Name)
MANAGER
(Title)
3-10-03
(Date)

AT&T CORP
By: Patricia L. Hulquist
    (Authorized Signature)
PATRICIA L. HULQUIST
(Typed or Printed Name)
DATA SERVICES PRODUCT MGR.
(Title)
3-17-03
(Date)

07/31/2001                          AT&T PROPRIETARY                          ma-vd-alascom-sig.doc

SENT BY:                          3- 7-'3  '3:43PM ;       BUSINESS SALES→      1 907 443 2487;# 3/

For AT&T Administrative Use Only

ALASCOM Attachment No. 3
Original Effective Date:  August 9, 2000
Amended Effective Date:  September 5, 2001

As a result of the FCC Detariffing Order, this document is now being referred to as a Service Order Attachment Voice/Data Services "Attachment" and AT&T Tariffs are now being referred to as their successor, the AT&T Business Service Guide at http://att.com/serviceguide/business ("Service Guide"). This document replaces and supersedes the previously filed version of the Contract Tariff.

## GENERAL PROVISIONS

I. **Customer's Initial Service Date** - The date on which the term of this Attachment begins is referred to as the Customer's Initial Service Date (CISD).  The rates and discounts specified in this Attachment will apply commencing at the CISD.  The CISD is the date that the Customer begins service under this Attachment.

1. **Services/Offers Provided** - AT&T will provide the following Services/Offers to the Customer under this Attachment pursuant to AT&T Business Service Guide located at http://www.att.com/serviceguide/business, (the "Service Guide") as amended from time to time.  The Rates, Discounts and other provisions stated in this Attachment are in lieu of the comparable provision stated in the Service Guide.

A. Alascom Basic Frame Relay Service (FRS)
B. Alascom Private Line Services
C. Alascom Private Line Local Channel Services

2. **Attachment Term; Renewal Options** - The Customer must select a term of either two years, three years, four years, or five years.  No renewal option is available for this Attachment.

3. **Minimum Commitments/Charges**

A. **Alascom Basic Frame Relay Service** - The Customer must select one of the following FRS Data Minimum Annual Revenue Commitments (DMARC-FRS) for the FRS Services under this Attachment for each year of the Customer Selected term:

| ATTACHMENT TERM YEAR MARC | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 |
|---|---|---|---|---|---|
| | $12,000 | $24,000 | $24,000 | $24,000 | $24,000 |
| | $30,000 | $60,000 | $60,000 | $60,000 | $60,000 |
| | $60,000 | $120,000 | $120,000 | $120,000 | $120,000 |
| | $108,000 | $216,000 | $216,000 | $216,000 | $216,000 |
| | $150,000 | $300,000 | $300,000 | $300,000 | $300,000 |
| | $300,000 | $600,000 | $600,000 | $600,000 | $600,000 |

The DMARC-FRS will be satisfied by undiscounted FRTP Eligible FRS Charges as specified in the Service Guide, for the Services/Offers Provided under this Attachment.  If, on any anniversary of the CISD, the Customer has failed to satisfy the DMARC-FRS for the preceding year, the Customer will be billed a shortfall charge in an amount equal to the difference between the DMARC-FRS and the total of the actual undiscounted FRTP Eligible FRS Charges for the FRS components in service for that year under this Attachment.

For AT&T Administrative Use Only

**ALASCOM Attachment No. 3**
**Original Effective Date:  August 9, 2000**
**Amended Effective Date:  September 5, 2001**

**4.  Attachment Price**
Regardless of any stabilization of rates that may appear in this Attachment for the Services Provided, AT&T reserves the right to increase charges as a result of expenses incurred by AT&T relating to regulatory assessments stemming from an order, rule or regulation of the Federal Communications Commission or other regulatory authority or court having competent jurisdiction (including but not limited to payphone, PICC and USF related expenses).

  A.  The Attachment Price for the Alascom Services/Offers Provided under this Attachment is the same as the undiscounted Recurring and Nonrecurring Rates and Charges specified in the Service Guide.

**5.  Discounts** - All discounts are applied in the same manner as specified in the applicable section of the Service Guide, and no other discounts will apply.

  A.  **Alascom Basic Frame Relay Service** - The Customer will receive one of the following discounts, each month, in lieu of the FRTP discounts based on the Customer-selected term and commitment. These discounts will be applied to the sum of the FRTP Eligible FRS Charges in the same manner as the FRTP discounts as specified in the Service Guide and to the monthly recurring charges for the 56 kbps Data Channels associated with Alascom Basic Frame Relay Service.

| Commitment | 2 Year Term | 3 Year Term | 4 Year Term | 5 Year Term |
|---|---|---|---|---|
| $ 24,000 | 20% | 22% | 27% | 32% |
| $ 60,000 | 21% | 25% | 30% | 33% |
| $120,000 | 23% | 27% | 34% | 37% |
| $216,000 | 25% | 31% | 38% | 41% |
| $300,000 | 27% | 34% | 40% | 43% |
| $600,000 | 28% | 35% | 41% | 45% |

**6.  Classifications, Practices and Regulations**

  A.  Except as otherwise provided in this Attachment, the rates and regulations that apply to the Services/Offers Provided specified in Section 1., preceding, are as set forth in the Service Guide.

  B.  **Monitoring Conditions** - None.

  C.  **Promotions, Credits and Waivers** - The Customer is ineligible for any promotions, credits or waivers for the Services/Offers Provided under this Attachment, which are filed or which may be filed in the Service Guide.

The following credits and waivers will be applied to the Customer's bill subject to the following limitations: (1) all credits and waivers apply only to the Services/Offers Provided under this Attachment and as specified below; (2) any waiver not applied by the end of the Attachment will be declared null and void; (3) installation and monthly charge waivers apply only to new service components (unless otherwise specified below) and do not apply to service components disconnected and reconnected after the CISD; and (4) the service components must remain in service for a minimum period of 12 months (unless otherwise specified below). If any of the installed services components are disconnected prior to the end of the minimum retention period, Alascom will bill the Customer for the amount of the charges that had been waived under this section for each service component disconnected. Any such bill must be paid by the Customer within 30 days.

> ### For AT&T Administrative Use Only
>
> ALASCOM Attachment No. 3
> Original Effective Date:  August 9, 2000
> Amended Effective Date:  September 5, 2001

1.  **Nonrecurring Charges** - The following charges, as specified in the Service Guide are waived.

(a)  The Installation Charges for FRTP Eligible FRS components and 56 kbps Data Channels associated with Alascom Basic Frame Relay Service.

(b)  The Installation Charges for M-24 Multiplexing Office Function and Access Connection associated with 1.544 Mbps Private Line Service, Access Coordination Function associated with 1.544 Mbps Private Line Local Channel Service in conjunction with the FRS Services provided under this Attachment.

(b)  The Installation Charges for Access Connection associated with 56/64 kbps Private Line Service and Access Coordination Function associated with 56/64 kbps Private Line Local Channel Service in conjunction with the FRS Services provided under this Attachment.

2.  **Recurring Charges** - The following charges, as specified in the Service Guide, are waived.

(a)  The recurring charges for M-24 Multiplexing Office Function and Access Connection associated with 1.544 Mbps Private Line Service, Access Coordination Function associated with 1.544 Mbps Private Line Local Channel Service in conjunction with the FRS Services provided under this Attachment.

(b)  The recurring charges for Access Connection associated with 56/64 kbps Private Line Service and Access Coordination Function associated with 56/64 kbps Private Line Local Channel Service in conjunction with the FRS Services/Offers Provided under this Attachment.

D.  **Discontinuance** - The Customer may discontinue this Attachment under one of the following provisions without incurring any Termination Charges.  However, the Customer shall remain liable for shortfall charges (if any) incurred prior to the effective date of discontinuance, and any other charges and liabilities:

(1)  In the event of a breach of any material term or condition of this Attachment or the underlying applicable sections of the Service Guide by AT&T where such failure continues unremedied for thirty (30) days after receipt of written notice by AT&T;

(2)  Prior to the end of the Attachment Term, provided the Customer:  (1) is current in payment to AT&T for its existing telecommunication services; and  (2) replaces this Attachment with other domestic and/or international telecommunications Services (excluding Wireless or Broadband Service) provided by AT&T having: (i) equal or greater new total DMARCs, and (ii) a new term equal to or greater than the remaining term, but not less than 3 years.  If the Customer is terminating more than one Attachment per this provision, the new revenue commitment must be equal to or greater than the sum of all the revenue commitments in the Attachments that are being discontinued.  However, the Customer will be billed a Shortfall Charge equal to the difference between:  (1) the prorated DMARC for the year in which the Customer discontinues, and (2) the total of the actual undiscounted recurring charges used to satisfy the DMARC for that year under this Attachment, provided the amount in (2) is less than the amount in (1).

If the Customer discontinues this Attachment without cause other than as stated in the preceding paragraph, or if AT&T terminates as contractually permitted for cause (e.g., due to Customer's uncured material breach), prior to the expiration of the Attachment Term, a Termination Charge will apply.  The Termination Charge will be an amount equal to 35% of the unsatisfied DMARC for the year in which the Customer discontinues this Attachment and 35% of the DMARC for each year remaining in the Attachment Term.

E.  **Other Requirements** - Not Applicable.

F.  **Availability** - This Attachment is available only to Customers who:  (1) order this Attachment only once, either by the Customer or any Affiliate of the Customer, which is any entity that controls, is controlled by or is under common control with the Customer; and (2) who order service within 485 days after the Original Attachment Effective Date for initial installation of the Services/Offers Provided under this Attachment within 30 days after the date ordered

AT&T PROPRIETARY
Page 3 of 3

SENT BY:                    3- 7- 3 : 3:42PM :    BUSINESS SALES→    1 907 443 2487:# 2/

AT&T MA Reference No. MA-10201

## AT&T Alascom Service Order Attachment – Voice/Data Services Attachment

| CUSTOMER Legal Name ("Customer", "You" or "Your") | AT&T Corp. ("AT&T") | AT&T Sales Contact Name |
|---|---|---|
| Nook Net, LLC | AT&T Corp. | Dan   Freitas |
| **CUSTOMER Address** | **AT&T Address** | **AT&T Sales Contact Address** |
| PO Box 970<br>Nome<br>AK      USA<br>99762 | 55 Corporate Drive<br>Bridgewater, New Jersey  08807 | 210 East Bluff Dr. (MP 385)<br>Anchorage<br>AK      USA<br>99501-1100 |
| **CUSTOMER Contact**<br>Name: Ramon    Gandia<br>Title: Owner<br>Telephone: 907-443-7575<br>Fax: 907-443-2487<br>Email: rig@nook.net | **AT&T Contact**<br>Master Agreement Support Team<br>Email:   msa@att.com | **AT&T Sales Contact Information**<br>Telephone: 907-264-7254<br>Fax: 907-777-2534<br>Email: dfreitas @ alascom.att.com<br>Branch Manager: Lori    Eussen<br>Sales State: Gwen   Sales Region: Alaska |
| **CUSTOMER Billing Address**<br>Same | **Customer Account Information**<br>Master Customer Number (MCN):   ME 2539<br><br>Plan ID No. | |

This Service Order Attachment (including its addenda, if any) is an Attachment to the Master Agreement between Customer and AT&T dated _____ and is an integral part of that Agreement. The order of priority in the event of inconsistency among terms shall be the Attachment, then the Master Agreement, and then the AT&T Business Service Guide at http://www.att.com/serviceguide/business.

In the event any of the Services Provided are detariffed, any references in this Attachment to the "Applicable Tariffs" relating to such services will be construed as references to the non-tariffed successor, known as the AT&T Business Service Guide at http://www.att.com/serviceguide/business

In addition, for such domestic services, Section 9.2(iv) of the Master Agreement shall read as follows:

"FOR DAMAGES OTHER THAN THOSE SET FORTH ABOVE AND NOT EXCLUDED UNDER THIS AGREEMENT OR ANY ATTACHMENT, EACH PARTY'S LIABILITY SHALL BE LIMITED TO PROVEN DIRECT DAMAGES NOT TO EXCEED PER CLAIM (OR IN THE AGGREGATE DURING ANY TWELVE (12) MONTH PERIOD) AN AMOUNT EQUAL TO THE TOTAL NET PAYMENTS PAYABLE BY YOU FOR THE APPLICABLE SERVICE UNDER THIS ATTACHMENT DURING THE THREE (3) MONTHS PRECEDING THE MONTH IN WHICH THE DAMAGE OCCURRED. THIS SECTION 9.2(iv) SHALL NOT LIMIT YOUR RESPONSIBILITY FOR THE PAYMENT OF ANY AND ALL PROPERLY DUE CHARGES UNDER THIS AGREEMENT."

Customer hereby places an order for:

☐ New Attachment     ☒ Existing Attachment No. GCT 3     ☐ Amendment of Existing Attachment No.
                          3 Year, $120,000 Annual Commitment

---

**Existing Pricing Plan Replacement/Discontinuance:**
☐ Check here and identify any AT&T CT, Attachment, or other AT&T pricing plan being discontinued in conjunction with this order. Also specify the CT No./Attachment No., Plan ID No. or Main Billed Account No. (Note: Charges may apply as specified in the plan being discontinued.)
CT No./Attachment No. _____   Plan ID No. _____   Main Billed Account No. _____

---

SIGNATURE BELOW BY YOUR AUTHORIZED REPRESENTATIVE IS YOUR CONSENT TO THE TERMS AND CONDITIONS OF THIS SERVICE ORDER ATTACHMENT.

CUSTOMER: Nook Net, LLC

By: _Ramon Gandia_
    (Authorized Signature)

_Ramon F. Gandia_
(Typed or Printed Name)

_Manager_
(Title)

_03/10/2003_
(Date)

AT&T CORP.

By: _Patricia L Hulgujne_
    (Authorized Signature)

_PATRICIA L HULOWSI_
(Typed or Printed Name)

_DATA SERVICES PRODUCT MGR_
(Title)

_3-17-03_
(Date)

07/31/2001                    **AT&T PROPRIETARY**                    ma-v2-alascom-sig.doc

SENT BY:                        3- 7- 3 : 3:40PM :    BUSINESS SALES→    1 907 443 2487;# 3/35

For AT&T Administrative Use Only

**ALASCOM Attachment No. 3**
Original Effective Date: August 9, 2000
Amended Effective Data: September 5, 2001

As a result of the FCC Detariffing Order, this document is now being referred to as a **Service Order Attachment**. Voice/Data Services "Attachment" and AT&T Tariffs are now being referred to as their successor, the AT&T Business Service Guide at http://att.com/serviceguide/business ("Service Guide"). This document replaces and supersedes the previously filed version of the Contract Tariff.

## GENERAL PROVISIONS

1. **Customer's Initial Service Date** - The date on which the term of this Attachment begins is referred to as the Customer's Initial Service Date (CISD). The rates and discounts specified in this Attachment will apply commencing at the CISD. The CISD is the date that the Customer begins service under this Attachment.

1. **Services/Offers Provided** - AT&T will provide the following Services/Offers to the Customer under this Attachment pursuant to AT&T Business Service Guide located at http://www.att.com/serviceguide/business, (the "Service Guide") as amended from time to time. The Rates, Discounts and other provisions stated in this Attachment are in lieu of the comparable provision stated in the Service Guide.

A. Alascom Basic Frame Relay Service (FRS).
B. Alascom Private Line Services.
C. Alascom Private Line Local Channel Services

2. **Attachment Term; Renewal Options** - The Customer must select a term of either two years, three years, four years or five years. No renewal option is available for this Attachment.

3. **Minimum Commitments/Charges**

A. **Alascom Basic Frame Relay Service** - The Customer must select one of the following FRS Data Minimum Annual Revenue Commitments (DMARC-FRS) for the FRS Services under this Attachment for each year of the Customer-Selected term:

| ATTACHMENT TERM YEAR MARC | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 |
|---|---|---|---|---|---|
| | $12,000 | $24,000 | $24,000 | $24,000 | $24,000 |
| | $30,000 | $60,000 | $60,000 | $60,000 | $60,000 |
| | $60,000 | $120,000 | $120,000 | $120,000 | $120,000 |
| | $108,000 | $216,000 | $216,000 | $216,000 | $216,000 |
| | $150,000 | $300,000 | $300,000 | $300,000 | $300,000 |
| | $300,000 | $600,000 | $600,000 | $600,000 | $600,000 |

The DMARC-FRS will be satisfied by undiscounted FRTP Eligible FRS Charges as specified in the Service Guide, for the Services/Offers Provided under this Attachment. If, on any anniversary of the CISD, the Customer has failed to satisfy the DMARC-FRS for the preceding year, the Customer will be billed a shortfall charge in an amount equal to the difference between the DMARC-FRS and the total of the actual undiscounted FRTP Eligible FRS Charges for the FRS components in service for that year under this Attachment.

SENT BY:                        3- 7- 3 ; 3:43PM ;        BUSINESS SALES→        1 907 443 2487;# 4/

For AT&T Administrative Use Only

ALASCOM Attachment No. 3
Original Effective Date:  August 9, 2000
Amended Effective Date:  September 5, 2001

**4. Attachment Price**
Regardless of any stabilization of rates that may appear in this Attachment for the Services Provided, AT&T reserves the right to increase charges as a result of expenses incurred by AT&T relating to regulatory assessments stemming from an order, rule or regulation of the Federal Communications Commission or other regulatory authority or court having competent jurisdiction (including but not limited to payphone, PICC and USF related expenses).

A.  The Attachment Price for the Alascom Services/Offers Provided under this Attachment is the same as the undiscounted Recurring and Nonrecurring Rates and Charges specified in the Service Guide

**5. Discounts** - All discounts are applied in the same manner as specified in the applicable section of the Service Guide, and no other discounts will apply.

A.  **Alascom Basic Frame Relay Service** - The Customer will receive one of the following discounts, each month, in lieu of the FRTP discounts based on the Customer-selected term and commitment. These discounts will be applied to the sum of the FRTP Eligible FRS Charges in the same manner as the FRTP discounts as specified in the Service Guide and to the monthly recurring charges for the 56 kbps Data Channels associated with Alascom Basic Frame Relay Service:

| Commitment | 2 Year Term | 3 Year Term | 4 Year Term | 5 Year Term |
|------------|-------------|-------------|-------------|-------------|
| $ 24,000 | 20% | 22% | 27% | 32% |
| $ 60,000 | 21% | 25% | 30% | 35% |
| $120,000 | 23% | 27% | 34% | 37% |
| $216,000 | 25% | 31% | 38% | 41% |
| $300,000 | 27% | 34% | 40% | 43% |
| $600,000 | 28% | 35% | 41% | 45% |

**6. Classifications, Practices and Regulations**

A.  Except as otherwise provided in this Attachment, the rates and regulations that apply to the Services/Offers Provided specified in Section 1., preceding, are as set forth in the Service Guide.

B.  **Monitoring Conditions** - None.

C.  **Promotions, Credits and Waivers** - The Customer is ineligible for any promotions, credits or waivers for the Services/Offers Provided under this Attachment, which are filed or which may be filed in the Service Guide.

The following credits and waivers will be applied to the Customer's bill subject to the following limitations: (1) all credits and waivers apply only to the Services/Offers Provided under this Attachment and as specified below; (2) any waiver not applied by the end of the Attachment will be declared null and void; (3) installation and monthly charge waivers apply only to new service components (unless otherwise specified below) and do not apply to service components disconnected and reconnected after the CISD; and (4) the service components must remain in service for a minimum period of 12 months (unless otherwise specified below). If any of the installed services components are disconnected prior to the end of the minimum retention period, Alascom will bill the Customer for the amount of the charges that had been waived under this section for each service component disconnected. Any such bill must be paid by the Customer within 30 days.

AT&T PROPRIETARY
Page 2 of 3

SENT BY:        3- 7- 8 : 3:44PM :    BUSINESS SALES→    1 907 443 2487;# 5/ 5

> For AT&T Administrative Use Only
>
> **ALASCOM Attachment No. 3**
> Original Effective Date: August 9, 2000
> Amended Effective Date: September 5, 2001

1. **Nonrecurring Charges** - The following charges, as specified in the Service Guide are waived

   (a) The Installation Charges for FRTP Eligible FRS components and 56 kbps Data Channels associated with Alascom Basic Frame Relay Service.

   (b) The Installation Charges for M-24 Multiplexing Office Function and Access Connection associated with 1.544 Mbps Private Line Service, Access Coordination Function associated with 1.544 Mbps Private Line Local Channel Service in conjunction with the FRS Services provided under this Attachment.

   (b) The Installation Charges for Access Connection associated with 56/64 kbps Private Line Service and Access Coordination Function associated with 56/64 kbps Private Line Local Channel Service in conjunction with the FRS Services provided under this Attachment.

2. **Recurring Charges** - The following charges, as specified in the Service Guide, are waived.

   (a) The recurring charges for M-24 Multiplexing Office Function and Access Connection associated with 1.544 Mbps Private Line Service, Access Coordination Function associated with 1.544 Mbps Private Line Local Channel Service in conjunction with the FRS Services provided under this Attachment.

   (b) The recurring charges for Access Connection associated with 56/64 kbps Private Line Service and Access Coordination Function associated with 56/64 kbps Private Line Local Channel Service in conjunction with the FRS Services Provided under this Attachment.

D. **Discontinuance** - The Customer may discontinue this Attachment under one of the following provisions without incurring any Termination Charges. However, the Customer shall remain liable for shortfall charges (if any) incurred prior to the effective date of discontinuance, and any other charges and liabilities.

(1) In the event of a breach of any material term or condition of this Attachment or the underlying applicable sections of the Service Guide by AT&T where such failure continues unremedied for thirty (30) days after receipt of written notice by AT&T.

(2) Prior to the end of the Attachment Term, provided the Customer: (1) is current in payment to AT&T for its existing telecommunication services; and (2) replaces this Attachment with other domestic and/or international telecommunications Services (excluding Wireless or Broadband Service) provided by AT&T having: (i) equal or greater new total DMARCs, and (ii) a new term equal to or greater than the remaining term, but not less than 3 years. If the Customer is terminating more than one Attachment per this provision, the new revenue commitment must be equal to or greater than the sum of all the revenue commitments in the Attachments that are being discontinued. However, the Customer will be billed a Shortfall Charge equal to the differences between: (1) the prorated DMARC for the year in which the Customer discontinues, and (2) the total of the actual undiscounted recurring charges used to satisfy the DMARC for that year under this Attachment, provided the amount in (2) is less than the amount in (1).

If the Customer discontinues this Attachment without cause other than as stated in the preceding paragraph, or if AT&T terminates as contractually permitted for cause (e.g., due to Customer's uncured material breach), prior to the expiration of the Attachment Term, a Termination Charge will apply. The Termination Charge will be an amount equal to 35% of the unsatisfied DMARC for the year in which the Customer discontinues this Attachment and 35% of the DMARC for each year remaining in the Attachment Term.

E. **Other Requirements** - Not Applicable.

F. **Availability** - This Attachment is available only to Customers who: (1) order this Attachment only once, either by the Customer or any Affiliate of the Customer, which is any entity that controls, is controlled by or is under common control with the Customer; and (2) who order service within 485 days after the Original Attachment Effective Date for initial installation of the Services/Offers Provided under this Attachment within 30 days after the date ordered.

## AT&T Alascom Network Services
## Pricing Plan Commitment Form

---

### *Addendum A - Liability for Volume Pricing Plans:*

If the sum of the Eligible Charges in any month is equal to or greater than the Minimum Monthly Revenue Commitment, the Customer will be billed the sum of the Eligible Charges less the applicable discount.

➢ Example: If the Minimum Monthly Revenue Commitment is $50,000, and the sum of the Eligible Charges is $60,000, and the applicable discount is 10%, then the Customer will be billed $54,000 ($60,000 less the 10% discount of $6,000).

If the sum of the Eligible Charges in any month falls below the Minimum Monthly Revenue Commitment, the Customer will be billed an amount equal to the Minimum Monthly Revenue Commitment less an amount obtained by applying the applicable discount to the sum of the Eligible Charges.

➢ Example: If the Minimum Monthly Revenue Commitment is $50,000, and the sum of the Eligible Charges is $40,000, and the applicable discount is 10%, then the Customer will be billed $46,000 ($50,000 less $4,000 which is 10% of $40,000).

The Volume Pricing Plan is a discount plan based on a customer's monthly Frame Relay or Private Line service.

**Discontinuance of a Volume Pricing Plan with Liability** - Discontinuance of a Volume Pricing Plan for reasons prior to the expiration date of the applicable term, will result in Customer liability as specified below.

1.      For a Volume Pricing Plan discontinued prior to the completion of the first year of the Volume Pricing Plan term, the Customer is liable for 100% of the Minimum Monthly Revenue Commitment for the unexpired portion of the first year of the term plus 50% of the Minimum Monthly Revenue Commitment for the remaining portion of the applicable term.

➢ Example: Customer has $10,000 commitment for two years. This would allow them to have an 8% discount per month. The customer disconnects in the 11th month. The customer must pay $10,000 for the 12th month, plus they will have to pay 50% of the $10,000 for each month of the remaining length of the contract (12 months).

2.      For a Volume Pricing Plan discontinued after the first year of the Volume Pricing Plan term, the Customer is liable for 50% of the Minimum Monthly Revenue Commitment for the remaining portion of the applicable term.

Payment of the total amounts owed by the Customer under this regulation is due within thirty days of the date the plan is discontinued.

I have read and understand the restatement above of the provision in the related tariff relating to Liability as summarized above.

Customer Initials:_____

# AT&T Alascom Network Services
# Pricing Plan Commitment Form

These commitment levels will apply as provided in the Tariff. If the term or revenue commitment level is not available under the Tariff for the Pricing Plan selected above, the next lower term or revenue commitment level will apply. If there is no lower commitment level, no commitment level will apply and this form shall be void. The Pricing Plan term and discounts will start on a date determined according to the Tariff.

**Notice of Discontinuance of Existing Plan** (Check here if you are discontinuing an existing Discount Plan)

☐ Check here to identify any existing AT&T Alascom Pricing Plan(s) being discontinued in conjunction with this order. Provide the Plan ID No., or Main Billed Account No. of Plan(s) being discontinued (charges may apply as provided in the Tariff):

    EXISTING MASTER CUSTOMER NUMBER:        EXISTING BILL GROUP:
    EXISTING CIRCUIT NUMBER(S):

(Any plan(s) being discontinued must be identified as provided in the Tariff.)

YOUR SIGNATURE ACKNOWLEDGES THAT YOU UNDERSTAND THE TERMS AND CONDITIONS UNDER WHICH THE SELECTED PRICING PLAN WILL BE PROVIDED AND THAT YOU ARE DULY AUTHORIZED TO ORDER THE PRICING PLAN AND MAKE THE COMMITMENTS AS PROVIDED ABOVE.

| Customer | AT&T Alascom |
|---|---|
| Legal Name: _Ramon Gandia dba Nook Net_ | |
| By: _Ramon Gandia_ | Accepted by: _Lori X. Eussen_ |
| (Authorized Customer Signature) | (Authorized AT&T Alascom Signature) |
| _____ | _Lori A. Eussen, Sales Manager_ |
| (Typed or Printed Name and Title) | (Typed or Printed Name and Title) |
| _10-12-00_ | _10/17/00_ |
| (Date Signed) | (Date Signed) |

**EXHIBIT 2**

| ACCOUNT NAME | Nook Net |
| --- | --- |
| ACCOUNT NUMBER | 8002-018-5429 |
| ACCOUNT ADDRESS | PO Box 970, Nome, AK 99762 |
| SERVICE TYPE | Private Line |

| | Sep-03 | Oct-03 | Nov-03 | Dec-03 | Jan-04 | Feb-04 | Mar-04 | Apr-04 | May-04 | Jun-04 | Jul-04 | Aug-04 | Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Monthly Charges | $11,410.90 | $11,410.90 | $11,410.90 | $11,591.06 | $11,591.06 | $11,591.06 | $11,591.06 | $11,591.06 | $11,591.06 | $11,591.06 | $0.00 | $0.00 | $115,370.12 |
| Prorated | $5,086.86 | $0.00 | $0.00 | $0.09 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($5,022.80) | $0.00 | $164.14 |
| One Time | $1,062.66 | ($4,047.06) | $1,012.28 | $325.12 | $262.25 | $253.74 | $253.74 | $257.50 | $257.50 | $257.50 | $262.88 | ($113.92) | $94.19 |
| Total Tax & Surcharge | $164.91 | $105.20 | $110.72 | $99.17 | $134.66 | $135.48 | $135.48 | $135.54 | $135.54 | $135.54 | ($57.01) | ($2.37) | $1,232.86 |
| Payments Received | $0.00 | ($11,051.47) | ($7,500.00) | $0.00 | ($6,132.23) | ($4,000.00) | ($8,000.00) | $0.00 | ($6,000.00) | $0.00 | $0.00 | $0.00 | ($44,683.70) |
| Credit Adjustment | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($12,178.75) | ($12,178.75) |
| Debit Adjustment | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| TOTAL | $17,735.33 | $7,469.04 | $12,533.90 | $12,105.43 | $11,987.97 | $11,980.28 | $11,980.28 | $11,984.10 | $11,984.10 | $11,984.10 | ($4,816.93) | ($716.29) | $59,948.86 |

| SUMMARY | |
| --- | --- |
| TOTAL BILLED | $59,948.86 |
| Post Disc PAYMENTS | $0.00 |
| Post Disc Credit Adjustments | $0.00 |
| Post Disc Debit Adjustments | $0.00 |
| Prev Balance | $28,106.55 |
| Current Balance | $ 88,055.41 |

| ACCOUNT NAME | Nook Net |
|---|---|
| ACCOUNT NUMBER | 2100-8506-3153 |
| ACCOUNT ADDRESS | PO Box 970, Nome, AK 99762 |
| SERVICE TYPE | ARBOR |

| | Feb-04 | Mar-04 | Apr-04 | May-04 | Jun-04 | Jul-04 | Aug-04 | Sep-04 | Total |
|---|---|---|---|---|---|---|---|---|---|
| Monthly Charges | $1,356.75 | $1,356.75 | $1,356.75 | $1,356.75 | $1,356.75 | $1,356.75 | $0.00 | $0.00 | $8,140.50 |
| Prorated | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| One Time | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Total Tax & Surcharge | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Payments Received | ($1,600.00) | $0.00 | ($1,400.00) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($3,000.00) |
| Credit Adjustment | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($2,668.28) | $0.00 | ($2,668.28) |
| Debit Adjustment | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| TOTAL | $1,356.75 | $1,356.75 | $1,356.75 | $1,356.75 | $1,356.75 | $1,356.75 | $0.00 | $0.00 | $2,472.22 |

| SUMMARY | |
|---|---|
| TOTAL BILLED | $2,472.22 |
| Post Disc PAYMENTS | $0.00 |
| Post Disc Credit Adjustments | $0.00 |
| Post Disc Debit Adjustments | $0.00 |
| Prev Balance | $2,013.00 |
| Current Balance | $ 4,485.22 |

AT&T PROPRIETARY INFORMATION

9/14/2005 10:33 AM